## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| JASON AND DEBRA OBESTER, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 6:11-cv-03190-RED |
| BOUTIQUE HOTEL DEVELOPMENT | ) | |
| COMPANY, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

### SUGGESTIONS IN SUPPORT OF ALL DEFENDANTS' MOTION TO DISMISS

Michael K. Cully    MO 26794
Angela K. Drake    MO 35237
LOWTHER JOHNSON
901 St. Louis, 20th Floor
Springfield, Missouri 65806
(417) 866-7777 – Telephone
(417) 866-1752 – Facsimile
mcully@lowtherjohnson.com
adrake@lowtherjohnson.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................1

II. FACTS ..............................................................................................................3

    A. The Rental Program ....................................................................................3

    B. The Condominium Purchase Agreement.....................................................4

    C. The Unit Management Agreement ...............................................................5

III. ARGUMENT .....................................................................................................7

    A. THE EXTRINSIC DOCUMENTS ATTACHED TO THIS MOTION DO
        NOT CONVERT THE MOTION INTO ONE FOR SUMMARY
        JUDGMENT ..............................................................................................8

    B. THE PURCHASE CONTRACTS ARE NOT "INVESTMENT
        CONTRACTS," THEREFORE, THE SECURITIES LAWS DO NOT
        APPLY ......................................................................................................9

        1. There is No Common Enterprise............................................................9

        2. Plaintiffs Did Not Expect Profits Solely From the Efforts of Others ..10

        3. The Condominium Purchase Agreements Comply with S.E.C.
           Guidance Concerning the Sale of Condominiums...............................11

    C. PLAINTIFFS' AMENDED COMPLAINT MUST BE DISMISSED
        BECAUSE IT FAILS TO PLEAD FRAUD AND SCIENTER WITH
        PARTICULARITY.....................................................................................11

        1. Misleading Statements and Omissions.................................................11

        2. Scienter................................................................................................14

    D. PLAINTIFFS' STATE LAW FRAUD AND NEGLIGENT
        MISREPRESENTATION CLAIMS (COUNTS VII-X) FAIL BECAUSE
        THERE WAS NO RELIANCE AND PLAINTIFFS WAIVED THEIR
        CLAIMS....................................................................................................15

    E. PLAINTIFFS' UNFAIR MERCHANDISING PRACTICES ACT CLAIM
        (COUNT VI) FAILS BECAUSE THE CAUSATION ELEMENT CANNOT
        BE SATISFIED ON ..................................................................................16

Case 6:11-cv-03190-DW   Document 19   Filed 08/04/11   Page 2 of 27

F.     **PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM (COUNT XI) FAILS BECAUSE THERE IS NO DUTY ARISING FROM THE AGREEMENTTION** ...........................................................................16

G.     **PLAINTIFFS' CLAIM PURSUANT TO THE MISSOURI CONDOMINIUM ACT (COUNT XII) FAILS BECAUSE IT IS COUNTERFACTUAL** .......................................................................17

H.     **PLANTIFFS' CLAIMS FOR BREACH OF CONTRACT AND UNJUST ENRICHMENT AGAINST HILTON SHOULD BE DISMISSED** ...................18

I.     **PLANTIFFS WAIVED THEIR RIGHT TO JURY TRIAL** ...........................19

J.     **THE MAJORITY OF CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONSION** ...........................................................................19

     1.     **Counts I, II and IV are Time-Barred** ...................................................20

     2.     **Count III and V, Asserting Fraud Claims Under the Federal Securities Exchange Act of 1934 And the Missouri Securities Act, are Time-Barred** ....................................................................21

     3.     **Most Plaintiffs' State Law Fraud Based Claims are Time-Barred** .....22

IV.     **CONCLUSION** .........................................................................22

## TABLE OF AUTHORITIES

### Cases

*Alunni v. Development Resources Group*, 2009 WL 2579319 (M.D. Fla. 2009) .................... 7, 14
*Anselmo v. Manufacturers Life Ins. Co.*, 771 F.2d 417 (8th Cir. 1985) ...................................... 15
*Arnold v. Erkmann,* 934 S.W.2d 621 (Mo. Ct. App. E.D. 1999) ................................................... 15
*Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc*., 2006 WL 3825103 (W.D. Mo. 2006) .. 2, 15
*Cowbell, LLC v. Borc Bldg. & Leasing Corp*., 328 S.W.3d 399 (Mo. Ct. App. 2010) ............... 14
*Cridlebaugh v. Putnam Cty. St. Bank*, 192 S.W.3d 540 (Mo. App. 2006) ................................. 18
*DeMarco v. LaPay,* 2009 WL 3855704 (D. Utah 2009) ........................................................ 7, 14
*DeWit v. Firstar*, 879 F. Supp. 947 (N.D. Ia. 1995) ....................................................................... 9
*Garcia v. Santa Maria*, 528 F. Supp 2d 1283 (S.D. Fla. 2007) ................................................... 21
*Garcia v. Santa Rosa*, 528 F.Supp.2d 1283 (S.D. Fla. 2007) ............................................. 2, 8, 14
*Gustafson v. Alloyd,* 513 U.S. 561 (1995) ..................................................................................... 20
*Howard v. Turnbull*, 316 SW3d 431 (Mo. App. W.D. 2010) ...................................................... 18
*Keveney v. Missouri Military Acad*., 304 S.W.3d 98 (Mo. banc. 2010) ..................................... 18
*Khaliki v. Helzberg Diamond Shops, Inc*., 2011 WL 1326660 (W.D. Mo. 2011) ....................... 13
*Kushner v. Beverly Enterprises*, 317 F.3d 820 (8th Cir. 2003) ..................................................... 8
*Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624 (Mo. 1997) ......................................... 19
*Midwest Energy, Inc. v. Orion Food Sys., Inc*., 14 S.W.3d 154 (Mo. Ct. App. 2000) ................. 14
*Mosher v. Southridge Associates, Inc.*, 552 F.Supp. 1231 (W.D. Pa. 1982) ............................... 10
*Owen v. General Motors Corp.*, 533 F.3d 913 (8th Cir.2008) ...................................................... 21
*Plubell v. Merck & Co., Inc*., 289 S.W.3d 707 (Mo. Ct. App. W.D. 2009) ................................. 15
*S.E.C. v. Kirkland*, 521 F. Supp. 2d 1281 (M.D. Fla. 2007) ......................................................... 9
*S.E.C. v. Koscot*, 497 F.2d 473 (5th Cir. 1975) .............................................................................. 9
*S.E.C. v. W.J. Howey*, 328 US 293 (1946) ...................................................................................... 9
*Salameh v. Tarsadia Hotels*, 2011 WL 1044129 (S.D. Cal. 2011) ....................... 8, 11, 14, 20, 21
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................................... 13, 14
*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837 (2002) ............................................... 9
*United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883 (8th Cir.2003) ................ 11
*Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994) ...................................................... 10

### Statutes

15 U.S.C. § 77(m) ..................................................................................................................... 19, 20
MO. REV. STAT. § 409.5-501 ........................................................................................................ 20
MO. REV. STAT. § 409.5-509(a) ................................................................................................... 14
MO. REV. STAT. § 409.5-509(j) .............................................................................................. 19, 20
MO. REV. STAT. § 448.1-103(16) ................................................................................................ 17
MO. REV. STAT. § 448.2-106 ....................................................................................................... 17
MO. REV. STAT. § 516.100 ........................................................................................................... 21
MO. REV. STAT. § 516.120 ........................................................................................................... 21
MO. REV. STAT. 409.1-102(28))(D) .............................................................................................. 9

### Rules

F.R.C.P. 12(b)(6) ...................................................................................................................... 1, 20
F.R.C.P. 9(b) ............................................................................................................................. 1, 13

## I.      INTRODUCTION

COME NOW the Defendants, Boutique Hotel Development Company, L.L.C. d/b/a

Hilton Promenade at Branson Landing, Promenade Development Company, L.L.C., Hilton

Worldwide, Inc, HCW, L.L.C., BLR Downtown Realty, L.L.C., The Branson Landing Master

Association, Inc., HCW Management Consultants, L.L.C., and HCW Development Company,

L.L.C., pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and request the Court to

dismiss all claims.

By way of overview, Plaintiffs' condominiums at the Branson Landing are not cash

flowing at the rate Plaintiffs desire. Plaintiffs' disappointment in their real estate purchases drove

the filing of this lawsuit, which alleges thirteen counts, brought by 74 Plaintiffs against 8

Defendants, ranging from federal securities law fraud to state law breach of contract.  Plaintiffs'

disappointment in rental income, however, does not provide a basis for claims of federal

securities fraud, or any other claim.

Investments are common occurrences.  Many asset purchases are made with the hope that

there will be a profit realized at some point in the future - precious metals, rare books, and

baseball cards often become fruitful investments over time. Some investments contain income

potential immediately upon purchase, as with rental property. The most common investment is a

home. However, merely because an asset is an "investment" does not mean it is a "security."

Otherwise, all individuals investing in a home would become holders of a "security" by virtue of

that investment.[1]

---

[1] Indeed, for the Skinner Plaintiffs, their investment in the Condominiums paid handsomely.
Although not reflected in the Amended Complaint (hereinafter "AC"), the Skinners also

The reasons supporting dismissal at this time, and the key cases upon which Defendants rely, are as follows:[2]

- The express terms of the documents Plaintiffs signed establish the fraud claims are baseless because each purchaser acknowledged no promises regarding investment potential were made. *Garcia v. Santa Rosa*, 528 F.Supp.2d 1283 (S.D. Fla. 2007);

- No "investment contracts" regulated by the securities laws exist in connection with these condominium purchases. *Id.*

- Plaintiffs' allegations refer to projections of future events, at most, which are not actionable under state law. *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 2006 WL 3825103 (W.D. Mo. 2006).

Many cases, as discussed below, stand for the proposition that the purchase of a condominium, by itself, does not equate to the purchase of a "security." The Securities Exchange Commission has issued clear guidance on the matter in its 1973 Release. The Release defines three categories of condominium offerings which would be viewed as security offerings:

1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

Securities Act Release No. 5347 (1973), Ex. 1.

As reflected in the Release, something "more" than the purchase of the condominium in itself must exist to transform the condominium purchase into a "security." Plaintiffs' Amended Complaint alleges economic benefits were promised to Plaintiffs, (See e.g. AC ¶ 6) and rental

---

purchased Units 415A and B. The Skinners sold these Units within one year, netting $112,500 in profit. See Ex. 10 (collecting the Skinner closing documents)

[2] Defendants reserve the right to assert additional defenses if the matter is not dismissed on this Motion. For example, there are significant issues as to, inter alia, certain Plaintiffs' standing under the Securities Act of 1933, the reasonableness of Plaintiffs' alleged reliance and the amount of damages, if any.

requirements associated with the Plaintiffs' condominium purchases caused Plaintiffs to relinquish control over their condominiums (AC ¶ 3(c)). These allegations are an obvious effort to invoke the requirements of the SEC Release described above. However, the allegations are not true, as reflected in the actual documents Plaintiffs signed.

## II.    FACTS

Because the Amended Complaint repeatedly refers to the documents at issue, without attaching them, the documents are properly considered on this Motion to Dismiss under the authority of the cases cited in Section III.A below. The actual facts underlying the condominium purchases in the Branson Promenade Development are described in the following sections.

### A.    The Rental Program

Plaintiffs reference an "Ex. 4" in ¶ 11 of the Amended Complaint but do not attach it. The document is entitled "Promenade Rental Program General Summary and Commonly Asked Questions." This document is attached hereto as Ex. 2.  Plaintiffs allege they were each presented with this document "prior to the purchase." From this document, Plaintiffs' highlight the phrase, "fees/cost *are not expected* to exceed ten percent of the published rack room rates." (emphasis added)[3]

The document concludes by stating, "*This is a summary of certain terms and the manner in which it is anticipated that the Promenade Rental Program will operate. The details may change do (sic) to many factors…*" Thus to the extent fees/cost were "not expected" to exceed ten percent of rack room rate, any reliance on this statement of a future event is obviated by the later language in the document itself. More importantly, key statements in the document include the following:

**1.    Is participating in the Promenade Rental Program a requirement?**
- No it is not a requirement it is a benefit of Unit ownership.

---

[3] As discussed in Section III.D below, this allegation falls short of stating a claim, as projections are not actionable.

7. **Will the revenues from the rental program be managed or accounted for under a pooling arrangement?**
   - No.  A participating owner will not share in the rental proceeds of any other participating owner.
8. **Will the participating owners receive equal rental income?**
   - There are no guarantees or representations that the rental income from one Unit will be similar to another Unit.
9. **What representations and warranties are there regarding the Promenade Rental Program?**
   - No guarantees or representations of any kind or nature are being made regarding the Promenade Rental Program.  No guarantees or representations will be made with respect to the economic or tax benefits of ownership of a Unit or participation in the Promenade Rental Program.

*	*	*

Of course, the General Summary and Frequently Asked Questions do not constitute the actual transactional documents.  For purposes of this brief, Defendants highlight the condominium purchase of Plaintiffs Gus and Tracey Skinner - the third listed Plaintiffs in the First Amended Complaint. The Skinners' documents and allegations are used as an exemplar in measuring the sufficiency of the claims in this brief.  Defendants submit this is a fair approach in light of the allegations that Defendants engaged in a common course of conduct with the Plaintiffs.

**B.	The Condominium Purchase Agreement**

The Skinners signed a Condominium Purchase Agreement (hereinafter "CPA") on December 21, 2004, with Promenade Development Company, L.L.C.  Ex. 3.  None of the other named Defendants are a party to the CPA.  For $309,900, Promenade Development Company, LLC agreed to sell, and the Skinners agreed to buy, Units S405A and S405B, **subject to the terms and conditions of the CPA**.

These terms and conditions state that "*any agreements, promises or representations not set forth or referred to in this Agreement are of no force and effect*." See Ex. 3, ¶ 23.  The CPA further states, "*Neither party shall be bound by any verbal representations altering the terms of*

4

*the Agreement*." *Id*. at ¶ 16. The Skinners acknowledged they read and understood the Agreement, and had the opportunity to be advised by legal counsel. *Id*. at ¶ 24.

Attached to the CPA was a detailed "Purchaser's Acknowledgment," signed on the same day by the Skinners. Ex. 3A. The Purchaser's Acknowledgment contains nineteen specific affirmations, acknowledgements and consents relating to the Skinners' purchase of their condominium units. The Skinners initialed each and every one of the nineteen paragraphs. The Purchaser's Acknowledgment covered matters ranging from the operation of the condominium as a vacation and/or second home, (#2) to an acknowledgment that the condominium was primarily designed and established to be used in conjunction with the Boutique Hotel for transient hotel guests and/or guests of the Owner. (#19) The document stated fees would be owed to the Hotel. (#14) As reflected in the Complaint, a key acknowledgment is found in ¶ 7, which states:

> **No sales representative promised that the purchase of a Unit would provide investment potential, or tax advantages in regard to my purchase of the Unit(s). No representation has been made to me as to the amount of any gross rental income, the number of nights the Unit(s) will be rented, or the average daily rental price. I understand and acknowledge that participation in the rental program is not mandatory and that I may chose [sic] to enter the rental program of my own volition now or at a later date if I so desire.**

**C.      The Unit Management Agreement**

After signing the CPA on December 24, 2004, a Unit Management Agreement (hereinafter "UMA") between the Skinners and Defendant Boutique Hotel Development Company, L.L.C., d/b/a Hilton Promenade at Branson Landing, a Missouri Limited Liability Company, was signed years later on November 13, 2006, effective February 13, 2007. Ex. 4 Promenade Development Company, L.L.C. was not a party to this Unit Management Agreement, nor was any Defendant other than Boutique Hotel Development Company, L.L.C.

5

The UMA contained its own set of terms and conditions. The Skinners were the "Owners" under this Agreement, having purchased the condominium units in 2004. ¶ 21 of the UMA provides:

> **NO GUARANTEED RENTAL**. OWNER ACKNOWLEDGES THAT THERE ARE NO RENTAL INCOME GUARANTEES OF ANY NATURE, NO POOLING AGREEMENTS WHATSOEVER, AND NO REPRESENTATIONS CONCERNING THE RENTAL PROGRAM OTHER THAN WHAT IS CONTAINED IN THIS AGREEMENT. NEITHER COMPANY NOR MANAGEMENT COMPANY GUARANTEES THAT OWNER WILL RECEIVE ANY MINIMUM PAYMENTS UNDER THIS AGREEMENT OR THAT OWNER WILL RECEIVE RENTAL INCOME EQUIVALENT TO THAT GENERATED BY ANY OTHER UNIT IN THE RESORT.

¶ 22 of the UMA further provides:

> **OWNER'S ACKNOWLEDGEMENT.** THE OWNER UNDERSTANDS AND ACKNOWLEDGES THAT EXECUTION OF THIS AGREEMENT AND PARTICIPATION IN THE UNIT RENTAL PROGRAM AT THE RESORT IS OPTIONAL AND IS NOT A REQUIREMENT OF OWNERSHIP OF THE UNIT. THE OWNER FURTHER ACKNOWLEDGES THAT NEITHER COMPANY NOR MANAGEMENT COMPANY, NOR ANY OF THEIR RESPECTIVE OFFICERS, REPRESENTATIVES, EMPLOYEES, AGENTS, SUBSIDIARIES, PARENT COMPANY AND AFFILIATES HAS (I) MADE ANY STATEMENTS OR REPRESENTATIONS WITH RESPECT TO THE ECONOMIC OR TAX BENEFITS OF OWNERSHIP OF THE UNIT; (II) EMPHASIZED THE ECONOMIC BENEFITS TO BE DERIVED FROM THE MANAGERIAL EFFORTS OF THE COMPANY OR FROM PARTICIPATION IN THIS UNIT RENTAL PROGRAM; OR (III) MADE ANY SUGGESTION, IMPLICATION, STATEMENT OR REPRESENTATION, THAT ANY POOLING ARRANGEMENT WILL EXIST WITH PARTICIPANTS IN THIS PROGRAM OR THAT OWNER WILL SHARE IN ANY WAY IN THE RENTAL PROCEEDS OF OTHER UNIT OWNERS IN THE RESORT.

Of course, the UMA contained its own merger clause at ¶ 25 (b):

> *The parties hereto agree and acknowledge that this Agreement constitutes the entire Agreement between the parties and there are no oral or written amendments, modifications, other agreements or representations.*

## III. ARGUMENT

Recent decisions cast doubt on securities fraud claims of condominium purchasers. As the cases indicate, it is difficult to conceive individuals were duped into spending hundreds of thousands of dollars on a condominium where plain disclosures, at the time of the purchase, negate the fraud alleged.

In *Alunni v. Development Resources Group*, 2009 WL 2579319 (M.D. Fla. 2009),[4] the district court dismissed claims relating to condominiums located by Disney World. Like the Plaintiffs here, one of the *Alunni* plaintiffs claimed, "I was told that I could expect an occupancy rate of 75% to 80% at an average rate of $318 per night." The *Alunni* complaint myopically focused on pre-contract representations relating to the development, not the actual purchase contracts. In dismissing the claims, the court cited the contract terms, similar to those in the Skinners' documents highlighted above. The court found no "security" was at issue and further noted:

> . . . it seems incredible that anyone purchasing a $300,000.00 piece of property would blithely initial each page of, and then sign an approximately 30 page purchase agreement without some scrutiny and that, as a matter of law, not one, but two conspicuous merger clauses in that agreement would be of no moment. Despite the presumption of unequal bargaining power inherent in the federal securities laws, such a rule could grossly distort a fact-finder's assessment of an investor's reasonable expectations and the economic realities at work in a given case, as well as turn the law of contract on its head.

*Id.* at note 12.

This sentiment was echoed in *DeMarco v. LaPay,* 2009 WL 3855704 (D. Utah 2009) where the court began its analysis of fraud complaints arising from Park City condominiums, by noting "the sale of a condominium , by itself, does not constitute a security transaction." Citing *Alunni*, the court said:

> Many real estate purchases are entered into as investments. In establishing the existence of a security, it is not enough to allege a transaction was entered into as

---

[4] This case is on appeal to the 11th Circuit. It is fully briefed and ready for ruling.

an investment without alleging evidence of an additional agreement detailing activities sufficient to form a common enterprise. Due to the general investment like quality of real estate and the unusually high demand for rental properties in Park City, given its resort town nature, there is no doubt that the developer probably used the renting feature like the ski-in ski-out feature, as a hook to lure investors. However, marketing and advertising hooks do not change the character of the transaction, nor are they generally representations upon which a purchaser can reasonably rely especially in the face of clear language to the contrary.

Most recently, in *Salameh v. Tarsadia Hotels*, 2011 WL 1044129 (S.D. Cal. 2011), plaintiffs who purchased Hard Rock Hotel condominiums failed to assert any "plausible" security claims where contracts almost identical to those quoted above were signed.[5]

The validity of Plaintiffs' claims must necessarily be measured by the wording found in the documents signed by Plaintiffs. These documents describe a condominium purchase, not a scheme to market investment contracts as alleged in the in the Amended Complaint.

## A.   THE EXTRINSIC DOCUMENTS ATTACHED TO THIS MOTION DO NOT CONVERT THE MOTION INTO ONE FOR SUMMARY JUDGMENT

Documents referred to in a complaint may be reviewed on a motion to dismiss, without converting the motion into one for summary judgment. *See, Salameh v. Tarsadia Hotels, 2011 WL 1044129, nt.1* (in condo-tel development case, court may properly consider, and take judicial notice of, the Purchase Contracts and Rental Management Agreements on motion to dismiss); *Kushner v. Beverly Enterprises*, 317 F.3d 820 (8th Cir. 2003);

Plaintiffs' repeatedly refer to the "investment contract" without definition. In Count I, alleging securities violations, Plaintiffs quote verbatim ¶ 7 of the Purchasers' Acknowledgement, an attachment to the CPA, indicating the CPA is the "investment contract." See AC ¶ 124.  In addition, Plaintiffs specifically cite the UMA (¶ 117) and the Frequently Asked Questions (¶ 11). These documents are attached hereto as Exhibits 2, 3 and 4.

---

[5] *Salameh* is currently on appeal in the Ninth Circuit.

## B. THE PURCHASE CONTRACTS ARE NOT "INVESTMENT CONTRACTS," THEREFORE, THE SECURITIES LAWS DO NOT APPLY

Securities laws "are not a panacea for every alleged transactional wrong." *Garcia*, 528 F.Supp.2d at 292. Here, dissatisfied with the current state of the Branson condominium rental market, Plaintiffs seek to escape their UMA commitments by asserting the CPAs are "investment contracts" governed by federal securities laws. *See S.E.C. v. W.J. Howey*, 328 US 293 (1946) (a "security" under federal law includes an "investment contract," which is a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party.") [6]

It is well established that condominiums, by themselves, are not securities. *S.E.C. v. Kirkland*, 521 F. Supp. 2d 1281, 1289 (M.D. Fla. 2007) When the primary motivation for purchasing a condominium is personal use, "the securities laws do not apply." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852-53 (2002). Here, Acknowledgement #7 negates investment potential by its terms, and each Plaintiff confirmed s/he understood the condominiums were designed for operation *as vacation and/or second home.* Ex. 3A. Although the analysis could end here, the key elements of *Howey* are discussed in the next two sections.

### 1. There is No Common Enterprise

The circuits are split on whether the *Howey* "common enterprise" element must be "vertical" or "horizontal," referencing the parties involved in the alleged scheme. The 8th Circuit likely requires only "vertical" commonality, although this ruling has been questioned in light of evolving case law. *DeWit v. Firstar*, 879 F. Supp. 947 (N.D. Ia. 1995)

Under the "vertical commonality" test, the common enterprise element is satisfied if the fortunes of the investors "are inextricably tied to the efficacy" of the promoter or manager. *S.E.C. v. Koscot*, 497 F.2d 473, 479 (5th Cir. 1975). The test measures the amount of control the investor may exercise over the success of the investment. *Kirkland*, 521 F. Supp. 2d at 1292-93

---

[6] The definition of a security under the Missouri Securities Act tracks the *Howey* test. See. MO. REV. STAT. § 409.1-102(28))(D).

In this case, only the Plaintiffs had control over their condominiums after they purchased them. The oft cited ¶ 7 found in the Purchaser's Acknowledgement specifically states, "*I understand and acknowledge that participation in the rental program is not mandatory and that I may chose [sic] to enter the rental program of my own volition now or at a later date if I so desire.*"

There is even less reason to find a common enterprise under a horizontal commonality test. Horizontal commonality requires a pooling of interests between the developer or promoter and all the investors. *Wals v. Fox Hills Dev. Corp*., 24 F.3d 1016, 1018 (7th Cir. 1994). The horizontal commonality test would only be met if purchasers received an undivided share of a pool of rentals or profits. *Id*. This case does not even present a close question, as the UMA states in ¶ 21:

> **NO GUARANTEED RENTAL**. OWNER ACKNOWLEDGES THAT THERE ARE NO RENTAL INCOME GUARANTEES OF ANY NATURE, NO POOLING AGREEMENTS WHATSOEVER…….

### 2. Plaintiffs Did Not Expect Profits Solely From the Efforts of Others

Plaintiffs did not reasonably expect profits solely from others because there was no requirement that the unit be placed in any rental program. *Mosher v. Southridge Associates, Inc.*, 552 F.Supp. 1231 (W.D. Pa. 1982) is instructive on this point. There, plaintiffs alleged they "did not intend to use or occupy the condominium unit, but purchased it for investment purposes." *Id*. at 1232. The *Mosher* court dismissed the plaintiffs' securities claim. The court found several factors compelling, including that "the purchase of the condominium was not conditional upon plaintiffs' participation in any rental program" and "plaintiffs had sole discretion whether or not to rent the property or use a particular agent." The same analysis applies here, as reflected in the documents cited above. Moreover, Plaintiffs did not reasonably expect "profits" from others because Acknowledgement #7 negated any promise of investment potential.

### 3. The Condominium Purchase Agreements Comply with S.E.C. Guidance Concerning the Sale of Condominiums

The disclosures in the CPA and UMA heed the guidance from the SEC set out in the Introduction. The disclosures make plain there was no promise of investment potential, no rental pool arrangement, no mandatory rental arrangement, and no emphasis concerning economic benefits.

Further, the passage of time between the signing of the CPA and the signing of the UMA establishes the UMA was not an "ancillary agreement," creating a security out of a condominium purchase. See *Salameh* supra (dismissing security claim because, inter alia, of the "significant (time) gap" between the execution of the Purchase Contracts and the Rental Management Agreements.)

Notably, the SEC Release endorses the manner in which the units here were sold:

> **….an owner of a condominium unit may, after purchasing his unit, enter into a non-pooled rental arrangement with an agent not designated or required to be used as a condition to the purchases, whether or not such agent is affiliated with the offeror, without causing a sale of a security to be involved in the sale of the unit….**

### C. PLAINTIFFS' AMENDED COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO PLEAD FRAUD AND SCIENTER WITH PARTICULARITY

The Private Securities Litigation Reform Act ("PSLRA") requires that the complaint specify each statement allegedly misleading, and the reason why it is misleading. The Act requires defendant's state of mind be pled with particularity. Plaintiffs' Amended Complaint fails both requirements.

### 1. Misleading Statements and Omissions

The complaint must plead the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, why the statements were

false, when the acts occurred, who engaged in them, and what was obtained as a result. *United States ex rel. Costner v. URS Consultants, Inc.,* 317 F.3d 883, 888 (8th Cir.2003) This test is not met here.

The Skinners will again be used as an exemplar. Questions arising from the allegations regarding the Skinners' purchase include the following:

106. Plaintiffs, Gus and Tracy Skinner (husband and wife), on or about December 21, 2004, closed the purchase of units S405A&B, two of the Securities for $309,900.00. Prior thereto, Plaintiffs Skinner met with Defendants' sales representatives Dennis Evans and Lynette McBratney. **(who did the sales representatives represent?)** Although omitting all of the material facts set forth in paragraph 25 [sic] herein above, the sales representatives did discuss various scripted financial and economic benefits that would result from participation in Defendants' rental program. **(What was discussed and by whom, where and when? What did the "scripts" say?)** Specifically, the sales representatives stated the Hilton Promenade Boutique Hotel would be much more upscale than the comparative hotels in the area and compared the project to several other hotels. **(Did both representatives say this? When and where was it stated? How is this false?)** The sales representatives provided an anticipated occupancy rate of no less than 47% and an estimate of $269.00 per night as the lowest average room rental rate. **(Was this verbal? Was it in writing? Why is this misleading?)** The sales representatives also state [sic] that participation in the rental program, managed by Hilton, would be a great investment opportunity because the nearby Branson Convention center was booked for the next several years to draw in business. **(same)** The sales representatives told Plaintiffs that the rental program was through the Hilton Hotel Corporation and that the Hilton Promenade Boutique Hotel was made up of only   privately owned units. **(same)**

….. Defendants also uniformly represented in their purchase contract that the sale was not the sale of an investment opportunity. **(Which "Defendants"?  Why is this false?)**  The Security was purchased by Plaintiffs Skinner in reliance upon Defendants' material omissions and false and fraudulent statements. **(Which alleged statements and omissions?)** …. Defendants knew at the time of the sale that material information was being withheld and intentionally concealed this material information in order to close the sale. **(What material information and who concealed it in what document or conversation?)** Defendants knew at the time these statements were made these statements, and each of them, were false, but made them to defraud Plaintiffs Skinner. **(Which statements?  Just the ones in this paragraph?  How were they false?)** ….

Only five other Plaintiffs identify even a modicum of information relating to their pre-contract negotiations; the other 68 Plaintiffs are subsumed in ¶ 104 which states:

> Each Plaintiff named herein was subjected to like misrepresentations, omissions and concealments specifically listed in paragraph 102.  Examples of six such specific instances are enumerated for Plaintiffs Obester, Skinner…

This paragraph does not even attempt to satisfy the requirements of Rule 9(b) or the PSLRA. Moreover, it refers to the "misrepresentations" in ¶ 102 but there are none, only omissions are alleged.  As to the alleged omissions, there is no explanation as to why the omissions are material or perpetuate a fraud.[7]  Further, while each Plaintiff was allegedly subjected to "similar circumstances," this broad brush allegation is insufficient. Even the six Plaintiffs for whom some detail is provided have differing "statements" allegedly made to them. For example, the Obesters claim in ¶ 105 the estimated rental rate was $239.00 per night, whereas the Skinners allege in ¶ 106 the estimated rate was $269.00.  And, the Smiths complain

---

[7] Ex. 7 analyzes the veracity of the "omissions."  As reflected in the Exhibit, the omissions were the subject of disclosures in various documents the Plaintiffs signed.

in ¶ 107 that they were told the units "were very cheap and could be easily resold . . ." an allegation not found in the other Plaintiffs' respective paragraphs.

Rule 9(b)'s particularity requirements apply with equal force to state consumer fraud statutes as they do to common law fraud claims." *Khaliki v. Helzberg Diamond Shops, Inc.*, 2011 WL 1326660 (W.D. Mo. 2011) Therefore, all state law claims must be dismissed.

### 2. Scienter

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), the Supreme Court clarified the "[e]xacting pleading requirements" imposed by the PSLRA and held "an inference of scienter must be cogent and **at least as compelling** as any opposing inference of nonfraudulent intent." The Missouri Securities Act incorporates this pleading standard. MO. REV. STAT. § 409.5-509(a).

In this case, no allegations support an inference of scienter as to any one of the eight Defendants. The barren allegations group all Defendants together. The sales representatives are not linked to any Defendant.

Moreover, in Plaintiffs' words, "each Plaintiff herein was subjected to the same or similar circumstances." AC at ¶ 104. Therefore, it is a more reasonable inference that certain plaintiffs may never have even heard the alleged misrepresentations. Given the disclaimers of reliance on oral statements in the CPA and UMA, not only is the inference that Plaintiffs are suffering from buyers' remorse more compelling than an inference of intent to defraud, it is the only plausible inference. *Tellabs* mandates dismissal of the securities claims.

**D. PLAINTIFFS' STATE LAW FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS VII-X) FAIL BECAUSE THERE WAS NO RELIANCE AND PLAINTIFFS WAIVED THEIR CLAIMS**

"Reliance on fraudulent representations is unreasonable <u>as a matter of law</u> where the alleged misrepresentations contradict the express terms of a written agreement." *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 164 (Mo. Ct. App. 2000). "The law is well settled that one who signs a contract is presumed to have known its contents and accepted its terms." *Cowbell, LLC v. Borc Bldg. & Leasing Corp.*, 328 S.W.3d 399, 406 (Mo. Ct. App. 2010).

Plaintiffs signed and initialed the CPA and UMA and accepted all terms. Because the express terms disclaim the alleged misrepresentations, Plaintiffs cannot show justifiable reliance as a matter of law. Moreover, both the CPA and the UMA contained merger clauses obviating reliance on oral statements. As in *Garcia*, *Salameh*; *DeMarco*; and *Alunni,* the fraud claims fail.

Further, Plaintiffs allege they were told "anticipated" occupancy and "estimated" rental rates. AC ¶¶ 105-110. Plaintiffs complain "projections" were used in sales meetings and booklets. AC ¶ 5. These types of claims are facially insufficient as addressed by this Court in *Bath Junkie Branson, L.L.C. v. Bath Junkie, In*., 2006 WL 3825103:

> "Plaintiffs first claim that defendants' statements that Ms. Arney was 'going to be driving a truckload of money away ... every year' and that she was 'not going to have to worry about paying ... bills' were fraudulent or negligent misrepresentations. <u>'[P]redictions and projections regarding the future profitability of a business or investment cannot form a basis for fraud as a matter of law.</u>' *Arnold v. Erkmann,* 934 S.W.2d 621…..Defendants' statements were predictions of the franchise's future profitability. They are mere puffery and do not support plaintiffs' misrepresentation claims."

Finally, each Plaintiff signed the CPA <u>after</u> the alleged misrepresentations took place. As reflected repeatedly in the Amended Complaint, a key Acknowledgment is No. 7:

> **No sales representative promised that the purchase of a Unit would provide investment potential…. I may chose [sic] to enter the rental program of my own volition now or at a later date if I so desire.**

15

A valid fraud claim is relinquished when the victim of the fraud enters into a subsequent agreement with the alleged perpetrator concerning the same subject matter. *Anselmo v. Manufacturers Life Ins. Co*., 771 F.2d 417, 420 (8th Cir. 1985).

### E.     PLAINTIFFS' UNFAIR MERCHANDISING PRACTICES ACT CLAIM (COUNT VI) FAILS BECAUSE THE CAUSATION ELEMENT CANNOT BE SATISFIED

Plaintiffs allege, "Defendants also uniformly represented in their purchase contract that the sale was not the sale of an investment opportunity." AC ¶¶ 104, 106. This allegation serves as the death knell for the MPA claim because it defeats causation.

Under the Merchandising Practices Act, an alleged deceptive practice must result in a loss to the Plaintiff. *Plubell v. Merck & Co., Inc*., 289 S.W.3d 707 (Mo. Ct. App. W.D. 2009). In essence, a defendant's action must *cause* the damages alleged by a plaintiff. In this case, there is a fatal disconnect between the alleged misrepresentations and the damages claimed. Assuming Plaintiffs have been damaged at all, which Defendants deny, such damages arose after each Plaintiff signed the CPA, acknowledging there was no promise of investment potential. There can be no causation on these facts and the MPA claim must be dismissed.

### F.     PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM (COUNT XI) FAILS BECAUSE THERE IS NO DUTY ARISING FROM THE AGREEMENT

Plaintiffs do not claim they reposed trust and confidence in Defendants, but allege the fiduciary duty arises out of "signed agreements with Defendants whereby Defendants would, unsupervised by Plaintiffs, rent out and manage their units as hotel rooms as part of the Hilton Promenade Boutique Hotel and in return, Plaintiffs would receive income from the rental of the units." ¶ 201.

16

This "signed agreement" referenced by the Plaintiffs is the UMA, Ex. 4. This Agreement is between two parties, the plaintiff as "Owner," and Defendant Boutique Hotel Development Company, L.L.C., as "Company."

Plaintiffs' allegation that the UMA imposes a fiduciary duty on any defendant, other than Boutique Hotel Development Company, LLC is wide of mark. Moreover, even a cursory review of the UMA makes clear that *no* Defendant may be sued. There is one remedy, and it is termination of the Agreement:

> 19.  **DEFAULT BY MANAGER**.  If Manager shall default in the performance of its obligations under this Agreement and shall fail to cure such default within sixty (60) days after Manager's receipt of written notice from Owner detailing the default in question, <u>Owner may</u>, **as its sole and exclusive remedy**, <u>terminate this Agreement</u>…..

Finally, to the extent Plaintiffs complain about the fees, expenses and rotation of the Units (see e.g. ¶ 201), the UMA discloses every item complained about in ¶ 11.  For example, Plaintiffs complain about a "4% reserve fund fee;" however, this fee is <u>exactly</u> what is described in the UMA.  See Ex. 4, ¶ 5d.  A comparison of Plaintiffs' complaints about the fees and expenses, and the actual UMA provisions relating thereto, is found in Ex. 7.  In short, Plaintiffs complain about the details found in the very contract they knowingly signed.  The law does not provide a claim, however denominated, for buyer's remorse.

## G.  PLAINTIFFS' CLAIM PURSUANT TO THE MISSOURI CONDOMINIUM ACT (COUNT XII) FAILS BECAUSE IT IS COUNTERFACTUAL

Count XII alleges a violation of MO. REV. STAT. § 448.2-106, the Missouri Condominium Act. This section does not apply to the condominiums, as it only applies to "leasehold" condominiums.

MO. REV. STAT. § 448.1-103(16) defines a leasehold condominium as "a condominium in which all or a portion of the real estate is subject to a lease, *the expiration or termination of which will terminate the condominium or reduce its size*."

This is not a leasehold condominium, as reflected on page one of the Condominium Declaration (Ex. 8). The Declaration explicitly states that "the City has agreed to allow the Declarant (Promenade Development Company, LLC) to create the Condominium, sell units therein **as fee simple interest**, and to allow this Declaration to encumber the Property."    Ex. 8 A, #1.  Moreover, the Condominium Original Sale Certificate, incorporated into the CPA, explained that Promenade Development Company, LLC does not own the land upon which the Promenade Buildings are constructed but "*has entered into a long–term Master Lease with the City of Branson Missouri for the land. The city has joined in the execution of the Declaration **so that upon termination of the Master Lease the Condominium will not terminate.***" Ex. 8 B, p. 2. Plaintiffs' claim that they have been damaged because they were "not aware of their rights concerning the end of the 99 year land lease" (AC, ¶ 208) is, therefore, counterfactual.

## H.    PLANTIFFS' CLAIMS FOR BREACH OF CONTRACT AND UNJUST ENRICHMENT AGAINST HILTON SHOULD BE DISMISSED

Plaintiffs allege Hilton "breached its contract with Plaintiffs."  AC, ¶ 221.  However, there is no contract between Hilton and the Plaintiffs, as is conceded in part by Plaintiffs in ¶ 217, "there is no arrangement between Hilton Worldwide and the Plaintiffs to accept this significantly reduced rate nor does the scheme appear in the UMA." The most basic element for breach of contract is the existence of a contract between the parties and here none is pled.  See *Keveney v. Missouri Military Acad*., 304 S.W.3d 98, 104 (Mo. banc. 2010).

Plaintiffs refer to the UMA without ever asserting Hilton was a party to the Agreement. It is not, as the UMA allows Boutique Hotel Development Company, LLC the right to "engage a

professional management company to manage the Hotel and to include the Unit in Hotel inventory." Obviously this does not mean Hilton became a party to the UMA Contract.

To the extent that unjust enrichment is a separate claim within the Count, "unjust enrichment occurs where a benefit is conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust." *Cridlebaugh v. Putnam Cty. St. Bank*, 192 S.W.3d 540, 543 (Mo. App. 2006). This claim cannot stand as ¶ 4a of the UMA vests complete and unilateral control to the Manager to set rental rates. Unjust enrichment does not lie where an express contract governs the matters. See, *Howard v. Turnbull*, 316 SW3d 431 (Mo. App. W.D. 2010)

Finally, as described in Section F above, ¶19 of the UMA governs default by the Manager and limits the remedy to termination of the Agreement. "Manager" is defined in ¶1(d) of the UMA as interchangeable with "Management Company," which is further defined as that entity "engaged by the Company." Hilton is the "Manager" and cannot be subject to any claims arising under the UMA, because termination of the Agreement is Plaintiffs' sole remedy.

## I. PLANTIFFS WAIVED THEIR RIGHT TO JURY TRIAL

Section 31 of the "Terms and Conditions" of the CPA (Exh. 3) expressly waives Plaintiffs' rights to a jury trial. Missouri courts have made clear provisions such as this are enforceable against the parties. The right to a civil jury trial is a personal right and may be waived. *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 625 (Mo. 1997)

## J. THE MAJORITY OF CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Ex. 5 identifies key dates for each Plaintiff. The date of the CPA is important because it is the trigger for the applicable statute of limitations as discussed below. However, 25 Plaintiffs did not purchase their condominiums from the Developer; instead they purchased from individual

owners.[8] As a result, these Plaintiffs did not sign a CPA – they signed a standard real estate contract.

Plaintiffs claim they were subject to similar representations, and all "investment contracts" contained Acknowledgement #7 (expressing no promise of investment potential). AC, ¶ 124. Nonetheless, for statute of limitations purposes, Defendants focus on the date of the UMA for the Resale Plaintiffs, because there can be no dispute these Plaintiffs read the disclosures therein.

### 1. Counts I, II and IV are Time-Barred

The applicable statute of limitations for the 1933 Securities Act claims provides a three year outside time period from the date of sale, and a one year time period from the date of the discovery of the fraud (for the antifraud claim in Count II) and one year period from the date of the violation (for the registration claim in Count I) 15 U.S.C. § 77(m). Similarly, Mo. Rev. Stat. § 409.5-509(j) provides a one year statute of limitation applicable to registration requirements under the Missouri Securities Act, alleged in Count IV.

Most Plaintiffs bought from the Developer in 2005 and 2006. Their claims are barred because the CPA was signed before February 28, 2008, three years prior to the Tolling Agreement. Ex. 9. See, *Salameh*, supra (using the date of the Purchase Contract for statute of limitations: "the date of sale is when the parties entered into a binding contract").[9]

For the resale Plaintiffs, like the Dalkeys who bought from the Skinners, the claim in Count I is barred by the one year limitation period in 15 U.S.C. § 77(m), from the date of the violation. Since the resale Plaintiffs did not buy from the Developer, the only possible agreement they could be complaining about vis a vis the Defendants is the UMA. None of

---

[8] Of course, this fact raises significant issues as to the viability of any fraud claim against Defendants, who did not even sell these Plaintiffs their condominiums. Ironically, as reflected in Ex. 10, Plaintiffs Dalkeys purchased from the Skinners.
[9] The date of the actual closing was often much later than the signing of the CPA, because many Plaintiffs signed agreements in the preconstruction phase. See p. 1 of Ex. 3 referencing construction escrow.

the UMAs were signed after February 28, 2010 and therefore, none of the resale Plaintiffs timely filed a Section 12(a)(1) claim.

With respect to the fraud claim in Count II, it is barred by a one year limitation from the "date of the discovery," an issue described in detail in the following section.[10] Again, because the Resale Plaintiffs each signed the UMAs before February 28, 2010, their claims in Count II are barred.

### 2. Count III and V, Asserting Fraud Claims Under the Federal Securities Exchange Act of 1934 And the Missouri Securities Act, are Time-Barred

The applicable statute of limitations for Count III is found in 28 U.S.C. § 1658(b) which provides a two year from discovery limitation, with an outside limit of five years from the violation. Count V asserts the analogous claim under Missouri state law as found in Mo. Rev. Stat. § 409.5-501, which has an identical statute of limitations to the federal act, as found in Mo. Rev. Stat. § 409.5-509(j).

For all Plaintiffs who signed CPAs on or before February 28, 2006, their claims in Counts III and V are barred because five years have elapsed. The Plaintiffs who purchased from the Developer are also barred under the two year limitation because there is no question Plaintiffs knew the facts concerning the alleged violation(s) at the time they signed the CPA.

This result is the common sense approach taken in *Salameh*:

> … at the time Plaintiffs entered into the Purchase Contracts, they were aware of the limited control they would have over the units, that the units were required to be operated as part of the hotel, of the 28–day per year owner occupancy restriction, and that the units were not registered as securities. **Yet**

---

[10] Plaintiffs who did not purchase their condominiums initially from the Developer cannot state a Section 12 claim against the Defendants because they did not purchase a security directly from the Defendants; they lack standing under the statute which only protects those investors who buy in the initial offering. See e.g. *Gustafson v. Alloyd,* 513 U.S. 561 (1995)

**Plaintiffs still signed documents representing they were not relying on any representations made outside of the documents themselves, were not purchasing the units for investment purposes, and that rental of the units was voluntary. In light of these contradictions, Plaintiffs discovered or reasonably should have discovered the facts giving rise to their claims at the time they entered into the Purchase Contracts** . . .

*See also, Garcia v. Santa Maria*, 528 F. Supp 2d 1283 (S.D. Fla. 2007) ("Purchase Contracts were sufficient to put Plaintiffs on inquiry notice with respect to their securities fraud claims).

As a result, the CPA Plaintiffs (and Resale Plaintiffs who signed UMAs on or before February 28, 2009) are time barred under the two year provision because of the clear disclosures in the documents Plaintiffs signed.

### 3. Most Plaintiffs' State Law Fraud Based Claims are Time-Barred

Plaintiffs' state law claims in Counts VI-X sound in fraud, and fall within Missouri's 5 year statute of limitations, MO. REV. STAT. § 516.120. See, *Owen v. General Motors Corp.,* 533 F.3d 913, 921 n. 6 (8th Cir.2008) (MPA) The period begins to run when the damages are sustained and capable of ascertainment. MO. REV. STAT. § 516.100. For the reasons discussed above, Plaintiffs' state law fraud claims began to run at the time they contracted to buy their condominiums via the CPA. The claims of all Plaintiffs who bought from the Developer are barred. The claims of Resale Plaintiffs who signed UMAs on or before February 28, 2006 are also barred for the same reason.

## IV. CONCLUSION

For the reasons described above, Defendants respectfully submit that the Complaint must be dismissed, with prejudice.

_____/s/_____

Michael K. Cully    MO 26794
Angela K. Drake    MO 35237
LOWTHER JOHNSON
901 St. Louis, 20th Floor
Springfield, Missouri  65806
(417) 866-7777 – Telephone
(417) 866-1752 – Facsimile
mcully@lowtherjohnson.com
adrake@lowtherjohnson.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 4th day of August, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing via electronic mail to all counsel of record

_____/s/_____